---

**HURLEY v. COMMISSION OF FISHERIES OF VIRGINIA et al.**

(District Court, E. D. Virginia. January 17, 1920.)

1. **Fish ☞7(1)—Oysters planted on natural oyster lands abandoned to public.**

   One who plants oysters on natural oyster lands, and thus mingles them with the oysters growing naturally, is conclusively *held* to have abandoned them to the public, and has no property right therein, unless such right is conferred by statute.

2. **Constitutional law ☞43(2)—Invoking statute estops from denying validity.**

   A complainant cannot be heard to allege the unconstitutionality of a statute he has himself invoked and relied on.

3. **Constitutional law ☞278(6)—Complainant held to have no property in oysters within due process of law provision.**

   Complainant, who planted oysters on natural oyster lands of the state of Virginia, as delimited by official survey, where the state commission

of fisheries found that the land had never been assigned to him or his assignors, and therefore denied his right to remove the oysters under State Oyster Law, § 15, authorizing such removal where without his default the land has been assigned to the planter through mistake of an officer, *held* to have no property in such oysters of which he was unconstitutionally deprived by refusal to permit their removal.

Waddill, District Judge, dissenting.

In Equity. Suit by J. W. Hurley against the Commission of Fisheries of Virginia and others. On motion for preliminary injunction. Denied.

Thomas J. Downing, of Lancaster, Va., Herbert I. Lewis, of West Point, Va., and Thomas B. Snead, of Richmond, Va., for plaintiff.

Robert W. Shultice, of Norfolk, Va., for defendants.

Before PRITCHARD and WOODS, Circuit Judges, and WADDILL, District Judge.

WOODS, Circuit Judge. The complainant, J. W. Hurley, asks that the Commission of Fisheries and the two inspectors named in the bill be enjoined from removing the stakes and opening to the public two parcels of natural oyster land on the Rappahannock river, containing 31.90 acres, until he has been allowed time to remove the oysters planted by him thereon. The injunction is sought on the ground that the complainant is about to be deprived of his property (1) without due process of law, and (2) without compensation.

The Constitution of Virginia (section 175) provides:

"The natural oyster beds, rocks, and shoals, in the waters of this state, shall not be leased, rented or sold, but shall be held in trust for the benefit of the people of this state, subject to such regulations and restrictions as the General Assembly may prescribe, but the General Assembly may, from time to time, define and determine such natural beds, rocks or shoals, by surveys or otherwise."

The statute law of the state prohibits under penalty the occupancy and the planting of oysters and oyster shells in natural oyster beds, and requires each inspector to demand the removal of all stakes and other obstructions from such beds, rocks, or shoals in his territory, and upon failure of the trespasser to comply to remove them himself. 1 Pollard Code 1904, § 2153, act of 1916. The statute of 1892, amended by the act of 1894, provided for a survey of all natural oyster beds, to be conclusive evidence that all land within the survey was natural oyster land, and all without was not natural oyster land. The survey made under these statutes, known as the "Baylor Survey," is now the authoritative representation of the natural oyster lands of the state. Statutory provision was made for the leasing of other submerged lands and planting or propagation of oysters thereon. The person desiring to lease was required to obtain a location by application to the inspector and having it "ascertained and designated and surveyed" and "marked with suitable stakes," "or by other metes and bounds, courses and distances, having their places of beginning and ending designated by permanent objects on the shore agreed upon between the applicant and inspector." 1 Pollard Code 1904, § 2137,

amendment of 1916. Complainant in 1903 obtained by assignment leases of several parcels of submerged lands covering, as he claims, 47.48 acres.

The assignments and plats obtained by the original lessees, except one very small assignment, were duly recorded. Upon representation that the complainant had his stakes so set as to include natural oyster lands embraced in the Baylor survey, and that he was planting and gathering oysters thereon to the exclusion of the citizens of the state contrary to law, the commission of fisheries, in compliance with the statute, had the Baylor lines resurveyed by F. E. Ruediger, the engineer for the commission. There is no question of the accuracy of this survey of the Baylor lines, or of the demonstration by it that complainant has in possession two parcels of natural oyster ground within the Baylor survey, one of 26.90 acres and the other of 5 acres.

[1] If this were all, obviously the complainant would have no ground whatever to assert ownership of the oysters planted by him on the natural oyster rocks of the state. The rule of the common law is well settled that one who in good faith plants oysters on submerged land which is not natural oyster land—on which oysters do not grow naturally—has the ownership of them, and may remove them, although he has not leased the land from the state; but it is equally well settled that one who plants oysters on natural oyster lands, and thus mingles them with the oysters growing naturally, is conclusively held to have abandoned them to the public. Grace v. Willets, 50 N. J. Law, 414, 14 Atl. 559; Payne et al. v. Providence Gas Co., 31 R. I. 295, 77 Atl. 145, Ann. Cas. 1912B, 65, 73; People v. Morrison, 194 N. Y. 175, 86 N. E. 1120, 128 Am. St. Rep. 552; State v. Taylor, 27 N. J. Law, 117, 72 Am. Dec. 347.

The complainant at the hearing admitted, as was demonstrated by the resurvey of the Baylor lines, that he had planted the oysters on the state's natural oyster grounds; and it followed as a matter of law that they became the property of the state, open to the public, unless the complainant could bring himself within the terms of the statutes of 1899 and 1910 hereinafter referred to. In Commission of Fisheries v. Hampton Roads Oyster Packers' & Planters' Association, 109 Va. 565, 64 S. E. 1041, the Supreme Court of Appeals, reviewing all of the statutes passed prior to 1909 on the subject, held (1) that the Baylor survey was made by statute conclusive evidence of the area of the natural oyster grounds of the state; (2) that the statutory enactment to that effect was constitutional; (3) that, though the duties of an inspector are quasi judicial, neither he nor any other official can confer exclusive rights to oyster land within the survey by assignment or otherwise. The correctness of these conclusions is made so clear, both on principle and authority, by the reasoning of the court and the authorities cited, that further discussion would be superfluous. The complainant, having under the common law no legal interest in the land or the oysters, could not allege the statute under which the commission of fisheries ordered the natural oyster land opened to the public to be unconstitutional, on the ground that it did not provide that he should have notice and a hearing. Having by the common law no

property in the oysters planted, complainant had nothing to be compensated for, or to be protected by due process of law, unless he can show a property right conferred by the statute law of Virginia.

In this situation he invoked and relied upon the following statutes of 1899 and 1910, under which he applied to the commission of fisheries to be allowed to remove the oysters:

"When, by any resurvey of oyster-planting grounds or survey made to reestablish the lines of the state survey of natural oyster beds, rocks or shoals which shall hereafter be made under the direction of the commission of fisheries, it shall appear that any holder, *without his own default*, and *by mistake of any officer of the state, has assigned to him and included in the plat of his assignment* any portion of the natural oyster beds, rocks or shoals as defined by law, and it shall further appear that such holder has oysters or shells planted on the said ground, then, before the stakes shall be removed from said ground or the same opened to the public, the said holder shall be allowed a reasonable time, the length of which is to be determined by the commission of fisheries, in their discretion (and duly advertised), within which to remove his planted oysters or shells from the said ground."

After two full hearings, in which testimony was taken and argument made, the commission of fisheries decided that complainant had not brought himself within the conditions imposed by the act of 1910, and refused to allow him to remove oysters from the natural oyster land occupied by him.

[2] The complainant cannot be heard to allege the unconstitutionality of a statute he has himself invoked and relied on. Williams v. Eggleston, 170 U. S. 304, 18 Sup. Ct. 617, 42 L. Ed. 1047; Chicago, etc., Railroad v. Nebraska, 170 U. S. 57, 18 Sup. Ct. 513, 42 L. Ed. 948; Kansas City, etc., R. R. Co. v. Stiles, 242 U. S. 111, 37 Sup. Ct. 58, 61 L. Ed. 176; Kryger v. Wilson, 242 U. S. 171, 37 Sup. Ct. 34, 61 L. Ed. 229.

[3] The clause we have italicized shows that the state has conferred on a holder the right to remove oysters which he has planted on natural oyster ground on these express conditions: (1) The natural oyster ground must have been assigned to him and included in the plat of his assignment; (2) it must have been so included without his fault; and (3) it must have been so included by the fault of an officer of the state.

The evidence relied on to show assignment of the ground to complainant's predecessor under the lease is contained in affidavits to the effect that Hart, who was inspector at the time, was a very careful and diligent official; that the stakes were never removed from their original location; and that Hart would not have allowed them within the Baylor line, if he had not made the mistake of assigning the ground within the stakes to the lessees. Against this affidavits were submitted by the defendants to the effect that before complainant got the leases the stakes had been intentionally placed further out, within the Baylor survey, and that the stubs of the old stakes nearer the shore are still to be found. Any possible doubt on this point, however, is entirely dispelled by the affidavit of Ruediger, the engineer, in which he states:

"In examining all of the plats that I have been able to find, bearing upon this question, I have not found a single one which indicates that any oyster inspector, or surveyor, ever undertook to convey, or assign, or lease to an applicant, any portion of any of the ground held by Mr. Hurley to the northward of the dotted line of the Baylor survey. In making these researches, I have done so with the sole purpose of ascertaining the facts. My instructions from the commission have been to get all the information on this subject possible, and to verify it, if possible, so that a correct conclusion could be reached by the commission upon the true facts in the case. I have surveyed virtually every tract of oyster planting ground in the Rappahannock river, except in the county of Essex, which I have not yet reached in the work I am doing, and I have found almost innumerable cases just like the case now under discussion, and in doing this work I have not found that Mr. Segar, or his predecessor, Mr. Hart, ever assigned an acre of ground within the Baylor survey, either through mistake or otherwise. Their assignments all indicate that they were made with care, and with due regard to the rights of the public as defined by the Baylor survey. I have found that their assignments as a general thing come up to the Baylor line, or very close to it, but not in a single instance have I found that they erred in crossing that line and assigning to private individuals public rock which they were prohibited by law from assigning."

The conclusive proof that the natural oyster ground held by complainant was never assigned nor surveyed, as ground leased to complainant or his predecessors, and that his occupancy was not due to mistake of an officer, leaves the complainant outside of the confines of the statutes of 1899 and 1910 and without any right he can assert under them. The testimony is far from convincing that complainant has been himself without default, inasmuch as the assignments and plats were matters of public record; but it is not necessary to decide that point, since he has failed to meet the other two conditions of the statute.

The case, then, comes to this: When the complainant planted oysters on the natural oyster land, they became the property of the state under the common law. To relieve from possible hardship, the state by the statute last quoted conferred the right of a holder to remove the oysters on conditions set out in the statute. The statute does not take away any property, or injure any property right; on the contrary, it confers rights on the conditions set out. When the state creates and confers rights not before in existence, it may attach to them any conditions, and those who claim the benefits of the statute must accept its conditions. Cooley's Constitutional Limitations, 181. Since the bill, affidavits, and exhibits show that the complainant has no property right, either at common law or under the statute, to be taken without compensation or without due process of law, he is not injured by any of the statutes relating to the matter, and will not be heard to assert their invalidity. McCabe v. Atchison, Topeka & Santa Fé Railway Co., 235 U. S. 151, 35 Sup. Ct. 69, 59 L. Ed. 169; Louisville & Nashville R. R. Co. v. Finn, 235 U. S. 601, 35 Sup. Ct. 146, 59 L. Ed. 379; Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 35 Sup. Ct. 167, 59 L. Ed. 364; Hendrick v. State of Maryland, 235 U. S. 610, 35 Sup. Ct. 140, 59 L. Ed. 385; Mallinckrodt Works v. State of Missouri ex rel. Jones, 238 U. S. 41, 35 Sup. Ct. 671, 59 L. Ed. 1192.

Fortunately this conclusion works no hardship on the complainant.

Taking the most favorable possible view of his case, he has no substantial equity. The land from which he has unlawfully excluded the public has never been assigned to him or his predecessors, and no rent has been paid for it. The total area claimed by him and in his possession, as ascertained by Ruediger's survey, is 91.05 acres. The bill alleges he has been paying rent on 47.48 acres, in two tracts, 21.98 acres and 25.5 acres. This, taken from the 91.05 in his possession, leaves more than the 36.5 acres of natural oyster ground in his possession for which he has paid no rent.

Nor will there be any unjust advantage to the state or the public on opening this natural oyster ground to the public. True, complainant planted the oysters and will be deprived of the exclusive right to gather them; but it is also true that he has for 15 years appropriated to his own use all the natural oysters on the land which were the property of all the people of the state.

The injunction is denied, and the temporary restraining order revoked.

WADDILL, District Judge (dissenting). I regret my inability to concur with my Brethren in either their determination of the facts or their conclusions as to the law properly applicable and controlling upon the application for the injunction prayed for.

From my view of the case, the very least the complainant is entitled to is to be allowed a reasonable time within which to remove his oysters and oyster shells planted by him within the disputed area; that is, upon the natural oyster rocks found to be within the land as staked off and rented to the complainant—the defendant's contention being that these stakes had been changed since they were originally placed, and extended out into territory forbidden to be leased, or to be used other than by the public generally, for tonging oysters naturally grown thereon.

The complainant, and those under whom he claims, have for a period of more than 20 years been engaged in planting and raising oysters in the waters of the Rappahannock river, upon certain small lots of land formerly leased and set aside to them by the state, paying for said lands a yearly rental of $1 per acre. The land was regularly surveyed, plotted, and staked off by the state's representatives, and from that time until the beginning of this controversy, some 2 years ago, the rent was regularly paid each year, and the work of planting and propagating oysters thereon, and catching, marketing, and disposing of the same, was openly carried on, always under the eyes and with the full knowledge of the state's oyster inspectors, and others properly having the right of supervision and direction of what was being done.

The controversy over the right to occupy all the lands claimed by the complainant, came about this way: After he had held and uninterruptedly occupied the same, paying regularly his rentals therefor for many years to the state, a proceeding was inaugurated by ten citizens before the defendant board of fisheries, pursuant to the provisions of section 39 of the state's General Oyster Law, approved March 17, 1910, asking a resurvey of the lands of the public oyster grounds within

the territory occupied by the complainant, with the result that the board, without perhaps giving either the formal notice to those to be affected, or according them such a full and formal hearing as the law contemplated, found that portions of the ground within complainant's boundary, as staked off, was a part of the natural oyster rock or bed, and hence not subject to be leased to, or used by, the complainant. Upon the board's action being announced, the complainant, pursuant to another provision of the State Oyster Law (section 15), asked to be allowed a reasonable time within which to remove from the disputed territory his oysters and oyster shells planted thereon, which request the board denied. Sections 39 and 15 are as follows:

"39. *Surveying and Resurveying Planting Grounds, and Marking Lines of Geodetic Survey.*—The commission of fisheries is hereby authorized and empowered to select and appoint, on such terms as may be agreed upon, any surveyor, or surveyors, to survey, or resurvey, any oyster planting grounds, either in his own or any other county, and to re-establish and permanently mark any line or lines of the Baylor geodetic survey, which, in the judgment of the commission of fisheries, it may be necessary to define; or an application may be made to the commission of fisheries by ten citizens of the county to have any line or lines of the Baylor geodetic survey re-established and permanently marked: Provided a bond and security be given to the commission of fisheries that the applicants will pay all costs for surveying and marking: And provided further, that ten days' notice of such survey shall be given to all parties whose legal oyster tenures might be directly affected thereby; and if it should turn out that it was not necessary, in the opinion of the commission, to have said line or lines re-established, then all costs of the survey and marking shall be borne by the applicants; but if it shall appear that the Baylor geodetic survey had been encroached upon, then the cost shall be borne by the commission of fisheries and the bond given be void."

"15. *Resurveys of Planting Grounds.*—When, by any resurvey of oyster-planting grounds or survey made to re-establish the lines of the state survey of natural oyster beds, rocks or shoals which shall hereafter be made under the direction of the commission of fisheries, it shall appear that any holder, without his own default, and by mistake of any officer of the state, has had assigned to him and included in the plat of his assignment any portion of the natural oyster beds, rocks or shoals as defined by law, and it shall further appear that such holder has oysters or shells planted on the said ground, then, before the stakes shall be removed from said ground or the same opened to the public, the said holder shall be allowed a reasonable time, the length of. which is to be determined by the commission of fisheries, in their discretion (and duly advertised), within which to remove his planted oysters or shells from the said ground. * * *"

In reaching its conclusion, the defendant board, among other things, recited:

"From the evidence, introduced in this case, this commission is of opinion that the applicant did not show such a case as to entitle him to the relief asked for in his petition. It is admitted that the applicant is on a very considerable portion of the natural rock. It appears that the right to use this ground was purchased by Mr. Hurley from a company that had purchased this right from the original assignees, and that the stakes, at the time Mr. Hurley purchased, were in substantially the same position they now occupy; but it does not appear that the stakes were placed in that position either by Mr. Hart, the former inspector, or by the county surveyor, who made the surveys of the various small tracts which, now united in one holder, form the subject of this petition. Just how the stakes were moved out upon the public rock does not appear. The best evidence introduced on this subject indicates

that a former owner moved these stakes out about 20 years ago, and that he not only moved them out, but extended them a long distance to the eastward, into a place where they are almost surrounded by the natural rocks; the public ground being on the two longest sides, and one of the short sides of this extension. This ground appears to have been taken in this way about 5 years before Mr. Hurley purchased the rights of the persons or of the corporation occupying the ground. It has never been reassigned, and is still held by Mr. Hurley under the original assignments."

The board further certified that the complainant was ignorant of the fact that a portion of the public grounds had been taken in and was turned over to him. In passing upon the complainant's request, the defendant board held, in effect, that before the same could be granted, it was incumbent upon the complainant to show, first, that he was in possession of such natural oyster rock, bed, or shoal, without his own default; and, secondly, that he must have been placed in possession of the same by the mistake of some officer of the state, whose duty it was to assign planting grounds to him, properly applied for; and the board thereupon required the complainant to remove the stakes back to the line as prescribed by it, and thus throw open the grounds within the disputed territory to the public. There is no question as to the complainant having large quantities of oysters and oyster shells planted upon these grounds, variously estimated at from $8,000 to $15,000 in value, and that the same will be a total loss to him, if the defendant board's action stands.

The reasons assigned by the board for its action in thus summarily depriving the complainant of his property are too flimsy and unreasonable to receive serious consideration. In one breath, it required that he should show his freedom from fault in his occupancy of the natural oyster rocks, and in another it certifies that he was ignorant of the fact that a portion of the public grounds had been taken and turned over to him. The board further certified, as shown from the foregoing excerpt from their opinion, that the extension of the stakes in question occurred about 20 years before, and some 5 years before the complainant purchased the rights of the persons and companies occupying the grounds, and that there had never been any reassignment, and the complainant still held under the original assignment. The suggestion that it be shown that the possession of the disputed grounds was secured by a mistake on the part of some officer of the state, whose duty it was to make assignment of oyster-planting grounds, is even more untenable, when it is certified by the board that the stakes were improperly extended a quarter of a century ago, without knowledge of the complainant, and 5 years before he acquired the oyster grounds.

The claim is further made, in effect, that the complainant ought to suffer as a result of a wrong committed by his predecessor in title, although he was entirely innocent thereof, and the intimation is also conveyed that the complainant, because of his general knowledge regarding the complaints of persons in the section of the country as to encroachments upon the public grounds or natural oyster rocks, should have, in some manner not specified, known of the erroneous location of the ancient title. The defendants apparently forgot the po-

sition they occupy, when they seek to justify their action by these unreasonable claims. With what degree of propriety, of fairness, of justice and right, can they, and the state and its officers, make these contentions? The stakes have remained in their present position for more than a quarter of a century, marking and indicating the lands in question, and year in and year out during that entire period, acting by and through their accredited representatives, cognizant of the location of the oyster grounds subject to lease, they have yearly rented to and received from the complainant the rent specified by law for the premises in question, and he, in good faith, openly, and with their full knowledge, has planted oysters and oyster shells upon the lands so staked off and leased to him, and he has been so engaged and employed on quite a large scale, pursuant to the state's policy, and the law respecting the development of its vast and valuable oyster grounds and rights.

To summarily sever this relationship by reason of a change of the boundary lines under the water, upon a resurvey, as prescribed by law, without according to those to be affected thereby the rights secured to them to remove the oysters found within the territory affected by the change of line or boundary, certainly under circumstances such as exist in this case, would be both unjust and unconscionable. Such action can only be likened to that of a landlord, dispossessed of premises he had leased in good faith to a tenant, objecting to the tenant's taking with him his property, carried to and placed upon the leased premises. Some possible claim or equity might be set up by the true owner against the removal of property from premises shown to be his; but surely those placing a tenant in such an unfortunate position would not be heard to further add to the embarrassments and losses to which he had been subjected, by seizing what he had thereon.

However commendable the course of the defendant board may be in securing to the general public the right to the free use of the public oyster lands of the state, it should not allow its belated activity in this respect to make it do injustice to those with whom the state and its officers have done business in good faith and in a perfectly proper manner for so many years. No citizen should expect the state, in order to secure him in any right he may have in its oyster bottoms, to do more than fairly and justly deal with those to whom it has been leasing the same, in furtherance of its policy in respect thereto, and section 15, supra, as regards the very matter under consideration, was intended to afford such protection. To fritter away those rights on one technical pretext or another would be a travesty upon justice.

Considering the question of the constitutionality of the two provisions of the state Oyster Law, sections 15 and 39 above quoted, assailed by the complainant, the writer can but believe that the same are invalid, if what has been done in this proceeding can be successfully accomplished, in that they do not afford due process of law to those who may be deprived of their property thereunder. Due process of law contemplates always adequate notice, a fair hearing, at which shall be accorded and enforced the equal protection of the laws, and that jurisdiction shall have been reposed in the tribunal.

administering the laws. It is not enough that the parties whose rights are affected by chance may have had notice, or that the same may have been accorded as a matter of favor. The law itself must require notice, give the right to be heard, and afford an opportunity to that end, and the test of the constitutionality and validity is, not what was done, but rather what may have been done, under the statute assailed. Boggs v. Commonwealth, 76 Va. 989, 998, 999, 1,000, an opinion by Judge Staples, and cases cited; Central of Georgia Ry. Co. v. Wright, 207 U. S. 127, 28 Sup. Ct. 47, 52 L. Ed. 134, 12 Ann. Cas. 463; Chicago, etc., v. State of Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970; Coe v. Armour Fertilizer Works, 237 U. S. 413, 35 Sup. Ct. 625, 59 L. Ed. 1027. The reasonableness of the notice required, the extent to which opportunity is afforded for a hearing, including opportunity for judicial review in proper cases, are vital elements to be taken into account, in construing the validity of the statute.

Under section 39 of the Oyster Law, under review, it is evident that the commission of fisheries acts ex parte, and without consulting or affording to any one opportunity to be heard in determining whether they will order a survey or revision of oyster grounds and the establishment of lines in connection therewith, and they likewise act in making choice of the surveyor or surveyors to survey and establish such lines. Notice only (of 10 days) is required to be given of such survey to parties whose legal oyster tenures may be directly affected thereby. No opportunity is afforded, either to contest the propriety of ordering the resurvey, or of being heard upon the very important question of the selection of the parties to discharge the delicate duty of re-laying off the lines; nor is there opportunity afforded to review the action of the surveyor, save in the matter of costs, either by the board of fisheries or any judicial tribunal.

Section 15 of the act, supra, is even more objectionable from a constitutional standpoint. It was apparently intended to provide for the proper disposition of the oysters found upon the grounds where the lines had been rearranged; but no sort of provision is made for a hearing in respect thereto, the giving of notice, the convening of the board, or its hearing and decision. Nor is any sort of judicial review of the board's action provided; yet it is under that section that the board has actually concluded to take from the complainant thousands of dollars of his property, and boldly and bodily turn the same over to the general public, who may be fortunately so circumstanced as to be able to avail themselves of the rich harvest in oysters that will quickly flow from such a grand prize distribution.

What was said by Mr. Justice Pitney, speaking for the Supreme Court, in Ochoa v. Hernandez, 230 U. S. 139, 161, 33 Sup. Ct. 1033, 1041 (57 L. Ed. 1427), is peculiarly applicable here:

"Without the guaranty of 'due process' the right of private property cannot be said to exist, in the sense in which it is known to our laws. The principle, known to the common law before Magna Charta, was embodied in that charter (Coke, 2 Inst. 45, 50), and has been recognized since the Revolution as among the safest foundations of our institutions. Whatever else may be uncertain about the definition of the term 'due process of law,' all authori-

ties agree that it inhibits the taking of one man's property and giving it to another, contrary to settled usages and modes of procedure, and without notice or an opportunity for a hearing."

And the wisdom of that great jurist, Mr. Justice Bradley, was never more perfectly shown than in his concurring opinion on this subject, in Davidson v. New Orleans, 96 U. S. 97, 107 (24 L. Ed. 616), in which he says:

"I think, therefore, we are entitled, under the Fourteenth Amendment, not only to see that there is some process of law, but 'due process of law,' provided by the state law, when a citizen is deprived of his property, and that, in judging what is 'due process of law,' respect must be had to the cause and object of the taking, whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or none of these, and if found to be suitable or admissible in the special case, it will be adjudged to be 'due process of law,' but if found to be arbitrary, oppressive, and unjust, it may be declared to be not 'due process of law.'"

What could be more arbitrary, oppressive, and unjust than the action of the board of fisheries in denying to the complainant the right to remove his oysters from grounds held to be public grounds, placed thereon by him during the period of his lease, and treated by it as ground subject to lease, and for which the complainant regularly and yearly paid full rent therefor.

Moreover, it is manifest from the board's action that it did not seek to justify its course by any claim of right on the facts of the case, but merely upon erroneous conclusions as to what the complainant might or should have known, or ought to have shown the board, regarding matters confessedly beyond his control, and wholly out of his power, and which, as a matter of fact, had no material bearing on the controversy. The complainant was admittedly innocent respecting the extension of the lines of the land occupied by him, and he, as tenant from the state, was estopped from contesting the title of his landlord. But not so with the state. At any moment it could have either refused to lease the land, or have properly corrected, or investigated, or relocated the lines before so doing. To accept the lines as those apparently covered by the grant, and lease the same to an innocent holder under the grant, and take his money for doing the very thing the parties to the lease had in view, namely, develop the oyster lands of the state, and suddenly change and frustrate such lines, and keep his property placed upon the lands affected by such change, would be to consummate an actual fraud upon the complainant.

The majority of the court suggest that no hardship has befallen the complainant, since, taking the most favorable view, he had no substantial equity in his claim, inasmuch as the land upon which he planted his oysters, by reason of the change of lines, had never been actually leased to him. Aside from this extremely technical claim thus advanced, and which it seems to the writer is not supported by the evidence, the same is based upon an erroneous view of the law applicable to the case. In Coe v. Armour Fertilizer Works, 237 U. S. 413, 424, 35 Sup. Ct. 625, 629 (59 L. Ed. 1027), Mr. Justice Pitney, speaking for the Supreme Court, said:

"To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result, because he had no adequate defense upon the merits"—citing Rees v. Watertown, 19 Wall. 107, 123, 22 L. Ed. 72.

The further suggestion is made that, inasmuch as the complainant asked for his oysters, under section 15 of the act, he is thereby estopped from raising the question of the constitutionality of the provision. Surely this contention cannot be correct under the facts and circumstances here. This section 15, when read in the light of section 39, shows that, when the lines were lawfully changed under that section, certain rights inhered to the oyster planter to remove his oysters and oyster shells from the premises to be thrown open to the public by the proposed change, and if it should for a moment be supposed that one was to be penalized by the mere availing himself of the obvious benefits and privileges given by the statute, and could legally secure no rights thereunder, it would be but another evidence of the invalidity and unconstitutionality of this law.

The complainant is, in my judgment, clearly entitled to the injunction prayed for.